**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRYANT THURMAN,        ) | |
|                      ) | |
|        Plaintiff,      ) | |
|                      ) | No. 18 C 2720 |
|     v.                 ) | |
|                      ) | Hon. Virginia M. Kendall |
| UNKNOWN COOK COUNTY SHERIFF ) | |
| EMPLOYEES, COOK COUNTY     ) | |
| SHERIFF THOMAS J. DART, and THE ) | |
| COUNTY OF COOK,         ) | |
|                      ) | |
|        Defendants.     ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bryant Thurman brings this action against Cook County, Cook County Sheriff Thomas J. Dart, and several unknown individual Cook County employees for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Rehabilitation Act, 29 U.S.C. § 794; and various of his civil rights stemming from 71 days he spent as a pretrial detainee shackled to a hospital bed. Currently before the Court is Sheriff Dart's Motion to Dismiss. (Dkt. 15). Cook County subsequently moved to join Sheriff Dart's Motion to Dismiss, which the Court granted. *See* (Dkt. 28, 32). For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

The following facts are alleged in Thurman's Complaint and assumed to be true for purposes of Defendants' Motion to Dismiss. *See Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). On March 9, 2017, Thurman was arrested by Chicago Police Officers and charged with unlawful possession of a weapon, unlawful possession of ammunition, and unlawful

possession of a controlled substance. (Dkt. 1) at ¶ 16.[1] During the arrest, Thurman, who is 47 and morbidly obese, complained of chest pains and was taken to Mercy Hospital. *Id.* at ¶¶ 14, 15, 17. The next day, a Cook County judge set bail at $70,000, but Thurman was unable to post bond so Dart assumed custody of him at the hospital, where certain unknown Cook County Sheriff Employees ("Officers") were present and kept Thurman detained. *Id.* at ¶¶ 18–20. On March 13, Mercy Hospital cleared Thurman for release to the Cook County Jail, but both Cermak Health Services ("Cermak")—a division of the Cook County Health and Hospitals System established by the County to provide healthcare to detainees in the custody of the Sheriff—and the Cook County Jail refused to accept him due to his obesity. *Id.* at ¶¶ 12, 21–23.

On March 15, Elizabeth Feldman, a Cermak doctor, incorrectly reported in a letter to the judge presiding over Thurman's criminal case that he was non-ambulatory and it was not possible for Cermak to house him. *Id.* at ¶¶ 23–24. Some eight days later, Dr. Feldman submitted a sworn statement to the judge, again stating that Thurman was non-ambulatory and Cermak could not house him and also stating (again erroneously) that Thurman had given her permission to disclose his history of medical treatment. *Id.* at ¶ 24. Thurman's case was on the court call on ten dates, but the first time Thurman appeared in court and was formally arraigned on the charges was May 12—64 days after his arrest. *Id.* at ¶ 45. With the help of a friend who was present at the arraignment, he posted bond seven days later on May 19, and he was released from his hospital detention. *Id.* at ¶¶ 25, 49.

In total, Thurman was detained in the hospital for 71 days. *Id.* at ¶¶ 25–26. His wrist was shackled to a bed at all times. *Id.* at ¶¶ 13, 27. Even though medical personnel urged the Officers

---

[1] At trial on January 16, 2018, a state court judge found Thurman not guilty by way of directed verdict on the gun and ammunition possession charges and the State entered a *nolle prosequi* on the drug charge. (Dkt. 1) at ¶ 16 n.1.

to let Thurman get up, walk around, and use the restroom—and he was physically able to do these _____ things—the Officers repeatedly refused and Thurman was only unshackled to use the restroom eight times during the entire 71-day period. *Id.* at ¶¶ 27–30. Because he was not permitted to move, Thurman developed infected bed sores and became reliant on a wheelchair. *Id.* at ¶ 32.

In addition to restricting his movement, the Officers did not allow Thurman to make or receive any phone calls during the first 24 hours of his admission to Mercy Hospital (or any subsequent time), to meaningfully communicate with anyone during his detention including an attorney, to have visitors, or to meaningfully participate in his criminal case. *Id.* at ¶¶ 33–36, 41, 43. The Officers also denied Thurman's requests for a pen and paper so that he could write letters. *Id.* at ¶¶ 38–39. Thurman alleges that these restrictions prevented him from raising money to post bond at an earlier date and also that they were stricter than those in place for inmates at the Cook County Jail, who can make phone calls, write letters, communicate with attorneys, and be visited by family and friends. *Id.* at ¶¶ 37, 40, 47–49.

In his seven-count Complaint, Thurman brings the following claims: a claim for violation of the ADA and Rehabilitation Act by Sheriff Dart and Cook County for failing to accommodate him at either Cook County Jail or Cermak (Count I); a 42 U.S.C. § 1983 claim against the Officers for violation of his Fourteenth Amendment substantive due process rights on account of his restrictive detention (Count II); a § 1983 claim against the Officers for violation of his First Amendment rights for their denials of calls, visitors, and reading and writing materials (Count III); a § 1983 claim against the Officers for "denial of access to courts and counsel" (Count IV); a § 1983 claim against the Officers for violation of his right to timely arraignment (Count V); a claim for indemnification under 745 ILCS 10/9-102 by Cook County (Count VI); and a municipal § 1983

claim pursuant to *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978) against Sheriff Dart and Cook County. As relief, Thurman seeks compensatory and punitive damages, fees, and costs. (Dkt. 1) at 16. At present, the unknown Officers have not been identified or served. Sheriff Dart has filed a Motion to Dismiss all of Thurman's claims. Cook County has joined the motion. *See* (Dkts. 15, 28, 32).

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez*, 877 F.3d at 275 (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). "Specific facts are unnecessary, but the complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 832 (7th Cir. 2015). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, a "plaintiff's obligation to provide the grounds of [her] entitle[ment] to relief requires more than labels and conclusion." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014). The Court reads the complaint and assesses its plausibility as a whole. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

## DISCUSSION

### A.      ADA and Rehabilitation Act Claim (Count I)

Count I of the Complaint alleges claims for violations of § 504 of the Rehabilitation Act and Title II of the ADA by Sheriff Dart[2] and Cook County related to the time Thurman spent at Mercy Hospital instead of at Cook County Jail or Cermak.  Specifically, Thurman alleges that "the Sheriff and Cook County had agreed to participate in a coordinated approach to the delivery of health care to detainees in the custody of the Sheriff and to develop mutually acceptable policies and procedures to accommodate both security requirements and clinical needs."  (Dkt. 1) at ¶ 10. Yet, they failed to accept him at either Cook County Jail or Cermak on account of his obesity.  *Id.* at ¶¶ 58–59.

Section 504 prohibits a "qualified individual with a disability" from being "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," as a result of his disability. 29 U.S.C. § 794(a). Similarly, Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Given that the analysis under each statute is the same (with the exception that the Rehabilitation Act requires receipt of federal funding) and that Thurman can recover under only one statute, the court will analyze the two as one, referring predominantly to the ADA.  *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671–72 (7th Cir. 2012).

---

[2] Thurman sued Sheriff Dart in his official capacity, so the suit is treated as one against the county itself. *See* (Dkt. 1) at ¶ 9; *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008).  Thus, the naming of the County in this claim is duplicative.  In general, the Court recognizes that the county is a named defendant, as an indemnifier.  *See Carver v. Sheriff of LaSalle County*, 324 F.3d 947, 948 (7th Cir. 2003).

For a Title II claim, a plaintiff must show: (1) that he is a "qualified individual with a disability"; (2) that he was denied "the benefits of the services, programs, or activities of a public entity" or otherwise subjected to discrimination by such an entity; and (3) that the denial or discrimination was "by reason of his disability." *Lacy v. Cook County, Ill.*, 897 F.3d 847, 853 (7th Cir. 2018) (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) & 42 U.S.C. § 12132); *see also CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528–29 (7th Cir. 2014) (to prove disability discrimination, a plaintiff must show that (1) defendant intentionally acted on the basis of disability, (2) defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people). "State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(1)(B)); *see Crawford v. Ind. Dept. of Corr.*, 115 F.3d 481, 487 (7th Cir. 1997) (holding "that a state prisoner can make out a *prima facie* case of violation of the Americans with Disabilities Act"); *see also Thomas v. Dart*, 2018 WL 4016315, at *3 (N.D. Ill. Aug. 22, 2018) ("Title II of the ADA protects detainees with qualified disabilities against discrimination by a public entity[ ] and requires jails to reasonably accommodate their disabilities.") (quoting *Boston v. Dart*, 2015 WL 4638044, at *2 (N.D. Ill. Aug. 4, 2015)). Still, Defendants argue that Thurman has failed to sufficiently allege any of the elements of his ADA claim. *See* (Dkt. 15) at 3–5.

As to the first element—that Thurman was a qualified individual with a disability—the ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A–C). "Major life activities" is

defined to include caring for oneself, sleeping, concentrating, working, etc. 42 U.S.C. § 12102(2). Thurman's Complaint pursues the "actual disability" prong, alleging that he "suffered from several physical impairments, generally related to his diagnosed 'morbid obesity,' which substantially limited his ability to walk, sleep, breathe, stand, lift, bend, work, and care for himself." (Dkt. 1) at ¶ 15; *see also id.* at ¶ 57 ("Thurman's physical impairments, generally related to his diagnosed 'morbid obesity,' rendered him a qualified individual with a disability for purposes of the [ADA] . . . ."). Defendants argue that obesity alone is not a disability under the ADA. (Dkt. 15) at 3–4; (Dkt. 28) at 2.

Defendants are correct that this exact issue remains undecided in this circuit. All appellate courts to consider the issue have held that for obesity to be considered a disability, there must be an underlying disorder that causes the obesity. *See, e.g., Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1109 (8th Cir. 2016) ("Taken as a whole, the relevant statutory and regulatory language makes it clear that for obesity to qualify as a physical impairment—and thus a disability—under the ADA, it must result from an underlying physiological disorder or condition"); *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 442–43 (6th Cir. 2006); *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997). Although certain district courts have held that obesity alone can constitute a disability, judges in this district have held—at the summary judgment phase—that severe obesity is not a disability under the ADA unless there is an underlying physiological condition. *See, e.g., Richardson v. Chi. Transit Auth.*, 292 F. Supp. 3d 810, 815–818 (N.D. Ill. Nov. 13, 2017) ("[T]his Court concludes that severe obesity, by itself, fails to constitute a disability under the ADA. Rather, to qualify as a protected physical impairment, claimants under the ADA must show that their severe obesity is caused by an underlying physiological disorder or condition. This result follows from a plain reading of the ADA as amended and the EEOC's regulations and interpretive

guidance on the definitions of disability and physical impairment."); *Shell v. Burlington Northern Santa Fe Railway Co.*, 2018 WL 1156249, at *3 (N.D. Ill. March 5, 2018) (adopting "the majority view that obesity constitutes an ADA impairment only when it results from an underlying physiological condition or disorder"); *cf. Hargett v. Adams*, 2010 WL 3834458, at *4 (C.D. Ill. Sept. 14, 2010) ("There is a substantial question whether plaintiff's morbid obesity, which is not the result of any physiological disorder, alone amounted a disability under the ADA.").

Keeping this in mind, however, does not preclude Thurman's actual-disability ADA claim at this stage. Even if Thurman ultimately is required to prove that his obesity was caused by a physiological disorder or to elaborate on his obesity-related conditions, he was not required to allege the same. *See, e.g., Richardson v. Chi. Transit Auth.*, 2016 WL 6070359, at *3 (N.D. Ill. Oct. 17, 2016); *Lowe v. Am. Eurocopter, LLC*, 2010 WL 5232523, at *7–8 (N.D. Miss. Dec. 16, 2010) (noting that "a motion to dismiss is not the proper method for evaluating the merits of Plaintiff's" claim that obesity is a disability). As currently drafted, the Complaint alleges that he suffers from "several physical impairments" related to his obesity. The Court accepts this well-pled allegation as true. Whether or not Thurman can prove that his weight rises to the level of a disability under the ADA is not at issue here, because a motion to dismiss is not the proper vehicle to evaluate the merits of his specific assertions. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (stating that "claims lacking merit may be dealt with through summary judgment under Rule 56").

Moreover, in his response brief, Thurman expands his disability theory to include the "regarded as" prong: the possibility that Defendants refused his transfer into Cook County Jail or Cermak because Sheriff Dart "regarded [Thurman] as having [obesity-]related impairments," like heart disease, diabetes, sleep apnea, or any other disabling impairment, such as one that would

make him immobile. (Dkt. 23) at 6. As an initial matter, allegations such as these that are raised for the first time in a response brief and are outside the pleadings are generally not considered on a motion to dismiss. *See* Fed. R. Civ. P. 12(b). However, a plaintiff opposing a Rule 12(b)(6) motion or appealing a dismissal "has much more flexibility" and "may elaborate on his factual allegations" in the complaint. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). But this flexibility is not without limitation. The Court considers elaborations disclosed for the first time in a response brief only "so long as the new elaborations are consistent with the pleadings." *Id.*; *see also Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) (affirming grant of motion to strike exhibit to plaintiff's response brief that was not material to or consistent with the complaint). Likewise, the Court considers a new theory presented in an opposing brief only if it is supported by allegations in the complaint. *See Epstein v. Epstein*, 843 F.3d 1147, 1151 n.5 (7th Cir. 2016) (rejecting theory presented for the first time on appeal where it was unsupported by the allegations in the amended complaint).

Here, the perceived-disability theory raised in Thurman's response brief—to the extent it concerns Thurman's ability to move—is largely consistent with the allegations in Count I of the Complaint, particularly the allegations that Cermak employee Dr. Feldman had provided certain reports that Thurman was "non-ambulatory" and could not be housed at Cermak. (Dkt. 1) at ¶¶ 23–24. The Court thus concludes that, in addition to his actual-disability ADA claim, Thurman has stated a regarded-as ADA claim by alleging that Defendants perceived him as disabled on account of his obesity and inability to walk and that he was denied transfer to either the Cook County Jail or Cermak on this basis. *See Richardson*, 2016 WL 6070359, at *3 (at the motion to dismiss stage, finding the plaintiff's allegations that "Defendant perceived him as disabled due to his obesity" enough to state a claim). That being said, the remainder of Thurman's newly raised theory—that

he was not housed at the Cook County Jail or Cermak potentially on account of perceived heart disease, diabetes, or sleep apnea—finds no similar support in the Complaint and therefore is not considered in connection with this analysis.

As to the remaining two elements of Thurman's ADA claim (discrimination on the basis of disability), Thurman adequately has pled these elements by alleging that he was denied admission to Cermak or the Cook County Jail on account of his actual or perceived obesity and lack of mobility. On this point, Defendants argue that Thurman failed to allege that he was shackled to a bed at Mercy because he was obese, but this argument misconstrues Thurman's ADA claim, which does not involve the shackling, but instead the lack of accommodation for Thurman at either the jail or Cermak. In total, Thurman has sufficiently stated a claim under the ADA.

**B.     Section 1983 Claims Against the Officers**

**1.     Due Process Violation (Count II)**

To state a claim under § 1983, Thurman must allege that he was deprived of a constitutional right or statuary right and that the deprivation was caused by a person or persons acting under color of state law. *Kramer v. Vill. of N. Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004). Thurman brings Count II of the Complaint against the Officers in their individual capacities and alleges that they subjected Thurman to unlawful conditions of confinement in violation of his constitutional rights. In particular, Thurman alleges that the Officers violated his due process rights by "keeping him shackled to a bed twenty-four hours per day, denying him movement to the point that his health was threatened." (Dkt. 1) at ¶ 68. Again, Thurman was only unshackled to use the bathroom on eight occasions over his 71-day confinement despite being watched at all times by the Officers.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

and general well-being." *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). Yet, "[a]s one moves through the criminal justice system, the constitutional provisions governing one's treatment shift." *Sims v. Olszewski*, 2017 WL 1903121, at *3 (N.D. Ill. May 9, 2017). Specifically, the protections of the Fourth Amendment apply at arrest and until an arrestee has benefitted from a judicial determination of probable cause; then, the Fourteenth Amendment's due process principles apply to pretrial detainees; and finally, the Eighth Amendment applies following conviction. *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011); *see also Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006). Because Thurman has alleged that he was a pretrial detainee, the Fourteenth Amendment applies. *See Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018) ("the claims of state detainees being held on probable cause arise under the Fourteenth Amendment's Due Process Clause") (citing *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017)).

In the past, the application of the Fourteenth Amendment instead of the Eighth was a distinction without a difference because the prevailing deliberate-indifference analysis for both was functionally indistinguishable. *Id.* at 352. It remains true that for the analysis of either a Fourteenth Amendment claim or an Eighth Amendment claim, Thurman must allege that, objectively, the conditions to which he was subjected denied him "the minimal civilized measure of life's necessities," creating an excessive risk to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). However, shortly after the briefing of the instant motion was completed, the Seventh Circuit issued *Miranda v. County of Lake*, which altered the second component of this analysis. Under *Miranda* (and *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)), a pretrial detainee states a Fourteenth Amendment claim by alleging that (1) the defendants "acted purposefully, knowingly, or perhaps even recklessly," and (2) the defendants' conduct was

objectively unreasonable. *Miranda*, 900 F.3d at 353–54. Notably, this standard differs from that applied in the Eighth Amendment context: in order to state a claim under the Eighth Amendment for a hazardous condition of confinement, a plaintiff needs to allege that the state official deliberately ignored the serious condition. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Regardless of this distinction, Thurman satisfies both standards here.

### a. Unlawful Restraint & Lack of Movement

Beginning in *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court said that the proper question to guide determination of the legality of conditions of confinement in pretrial detention pursuant to the Due Process Clause is "whether those conditions amount to punishment of the detainee." *Id.* at 535. This is because the Due Process Clause prohibits any kind of punishment— not merely cruel and unusual punishment—of a pretrial detainee. *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996) (citing *Wolfish*, 441 U.S. at 535 n.16); *Kingsley*, 135 S. Ct. at 2475 ("pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically") (quotations omitted). To this end, the Fourteenth Amendment protects pretrial detainees from the use of bodily restraint used to punish the detainee. *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000) (citing *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982); *Wolfish*, 441 U.S. at 535–37; *Murphy v. Walker*, 51 F.3d 714, 717–18 (7th Cir. 1995)). "The use of bodily restraints constitutes punishment in the constitutional sense if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." *May*, 226 F.3d at 884 (citing *Wolfish*, 441 U.S. at 561); *accord Antonelli*, 81 F.3d at 1427.

Defendants argue that Thurman's shackling was reasonable and rationally related to the interest of maintaining security, particularly because the Complaint alleges that Thurman was arrested on gun, ammunition, and drug possession charges, was held at an unsecure hospital, and

was mobile. (Dkt. 15) at 6. Defendants are correct that this is a legitimate non-punitive government purpose. *Hart v. Sheahan*, 396 F.3d 887, 893 (7th Cir. 2005) ("[T]he detention facility has an interest in . . . preventing escapes."). Shackling detainees while they are on hospital visits furthers that purpose. *May*, 226 F.3d at 884 ("Certainly, shackling all hospital detainees reduces the risk of a breach of security and thus furthers a legitimate non-punitive government purpose."). But, even though the shackling was rationally related to a non-punitive purpose, it could still violate due process if the way in which it was executed was excessive in relation to its escape-prevention purpose. *See, e.g., Love v. Sheahan*, 156 F. Supp. 2d 749, 755 n.2 (N.D. Ill. 2001) ("Jail officials cannot legitimize excessive measures by merely asserting a non-punitive purpose.") (citing *Wolfish*, 441 U.S. at 539 n.20).

In *May*, the Seventh Circuit said that shackling hospital detainees "around the clock, despite the continuous presence of a guard" was "plainly excessive in the absence of any indication that the detainee poses some sort of security risk." *Id.* Although Defendants attempt to distinguish *May*, that case is directly applicable and controls here. *See* (Dkt. 24) at 6 (arguing that *May* is distinguishable because (1) armed guards monitored the plaintiff at all times in that case (where Thurman's allegations are not clear on that point here), (2) the plaintiff had been arrested only on a drug possession charge (where Thurman had been arrested on weapon and drug possession charges), (3) May first had been processed into the Cook County Jail before going to the hospital meaning he was already known to jail staff, and (4) at the hospital he was shackled to the bed by a wrist *and* a foot). Thus, the allegations contained in Thurman's Complaint lead the Court to a similar result to that in *May*. He alleges that he is a 47-year-old morbidly obese man with a limited ability to walk, breathe, stand, lift, and bend, among other things. (Dkt. 1) at ¶ 14–15. In addition, the Officers "stood watch over him and kept him detained." *Id.* at ¶ 20. On these allegations,

keeping Thurman shackled to the bed and refusing to allow him access to the bathroom except for eight occasions over a more than two-month period sufficiently alleges excessive restraint in violation of the Fourteenth Amendment. *See, e.g., Harper v. Dart*, 2015 WL 6407577, at *3 (N.D. Ill. Oct. 21, 2015) (wheelchair-bound inmate shackled to a bed in the presence of armed guards stated a claim for excessive restraint). The cases cited by Sheriff Dart do not change this result. *See, e.g., Moore v. Dart*, 2014 WL 7205575, at *4 (N.D. Ill. Dec. 18, 2014) (finding that a genuine issue of material fact existed as to whether Dart's shackling policy, under which Moore was shackled at two hospitals while undergoing medical treatment, was excessive and therefore unconstitutional); *Flores v. Sheriff of Cook County*, 2014 WL 1031494, at *5 (N.D. Ill. Mar. 18, 2014) (finding that a genuine issue of material fact existed as to whether the restraint policy is excessive).

As another aspect of this claim, Thurman adequately has alleged a Fourteenth Amendment violation with regard to the overall lack of movement he was allowed while hospitalized. "Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli*, 81 F.3d at 1432. Here, Thurman alleges that the lack of movement during his 10-week hospital detention caused him to develop infected bedsores and to lose his ability to move without a wheelchair. (Dkt. 1) at ¶ 32. At this stage, such allegations are enough to support a Fourteenth Amendment claim. *See Antonelli*, 81 F.3d at 1432 (allegations that Antonelli was not permitted to recreate for seven-week periods and was otherwise housed in a small area stated a claim under either the Fourteenth or Eighth Amendments); *cf. Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015) (detainee failed to state a claim where he did not allege that his movements were restricted to the point that he was unable to exercise inside his cell or in jail common areas). It may be that Defendants can produce evidence

in discovery to justify these kinds of restraints over this period of time, but Thurman's allegations are sufficient to allege a sufficiently serious or punitive condition of confinement and withstand a motion to dismiss on this claim.

### b. Officers' State of Mind

Under either the state-of-mind requirement for a Fourteenth Amendment claim, which objective unreasonableness, or for an Eighth Amendment claim, which is deliberate indifference, Thurman's Complaint adequately alleges this element. The Complaint alleges that the Officers refused to unshackle Thurman from the hospital bed and allow him to get up to use the restroom. Further, Thurman alleges that this refusal was despite the urging of medical staff to allow him to get up, walk briefly, and use the restroom and their warnings that "not allowing Thurman to move created serious health risks." (Dkt. 1) at ¶¶ 27–28, 30, 71. Accordingly, the Complaint sufficiently pleads that the Officers knew or should have known of the serious risks of the constant shackling and yet they refused to change course, going so far as to consciously disregard this risk. *Farmer*, 511 U.S. at 837. The motion to dismiss Count II is denied.

### 2. First Amendment Violation (Count III)

Next, Thurman claims that the Officers violated his First Amendment rights by denying him phone calls, pen and paper, and visitation. (Dkt. 1) at ¶¶ 75–76. As a result, his ability to communicate and visit with loved ones and friends was restricted, he remained in custody at the hospital longer, and his ability to post bond and communicate with the presiding judge was limited. *Id.* at ¶ 79. In other words, his right to association was violated. Although unlimited communication between detainees and their families and friends is not required, prisoners retain a limited constitutional right to intimate association. *Turner v. Safley*, 482 U.S. 78, 95–96 (1987); *Easterling v. Thurmer*, 880 F.3d 319, 323 (7th Cir. 2018) (per curiam). Accordingly, prison

officials may violate the Constitution by permanently or arbitrarily denying an inmate visits with family members in disregard of the factors described in *Turner* and *Overton v. Bazzetta*, 539 U.S. 126 (2003). *Easterling*, 880 F.3d at 323.

However, as Defendants rightly point out, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89; *see also Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004) ("When a prison regulation restricts a prisoner's First Amendment right to free speech, it is valid only if it is reasonably related to legitimate penological interests."). There are four factors that courts must consider in determining whether a prison regulation is constitutional: whether the regulation is rationally related to a legitimate and neutral governmental objective; whether there are alternative means of exercising the right that remain open to the inmate; what impact an accommodation of the asserted right will have on guards and other inmates; and whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns. *Turner*, 482 U.S. at 89–91; *see also Shaw v. Murphy*, 532 U.S. 223, 229 (2001). Defendants argue that Thurman has failed to plead that all of the *Turner* factors weigh in his favor regarding the restrictions he experienced. *See* (Dkt. 15) at 9. In other words, they argue that Thurman failed to plead that the restrictions placed on his communications were not reasonably related to legitimate penological interests, seeing that he was detained at a local hospital as opposed to the Cook County Jail, a facility designed with multiple layers of security. *Id.* at 8–9.

But application of the *Turner* analysis is often premature at the pleading stage. *Lindell*, 377 F.3d at 657–58. Still, dismissal at this stage can be proper where the penological reasons for the rule are obvious and well established. *Williams v. Wisconsin*, 336 F.3d 576, 582 (7th Cir. 2003); *see, e.g.*, *Pegues v. Kibby*, 2011 WL 6179207, at *3 (C.D. Ill. Dec. 13, 2011) (plaintiff

failed to state a claim for the denial of a personally owned computer where defendants submitted a "program director's memorandum" that articulated the connection between the computer ban and the security concerns). The allegations and arguments in this case are not amenable to dismissal on such grounds.

Here, Thurman sufficiently has alleged that he was denied all means of association and that such restrictions "were not related to a legitimate and non-punitive governmental goal; rather, they were intended to, and did, punish Thurman." (Dkt. 1) at ¶ 77. In so holding, the Court does not brush aside Defendants' argument that such restrictions were necessary to secure Thurman at a hospital without endangering hospital staff and other patients. (Dkt. 15) at 9. But this argument fails to link safety to the outright denial of phone calls, pen and paper, and visits alleged by Thurman during his 71 days at the hospital. Although it is possible to envision a security justification that would support the Defendants' actions, "this determination cannot be made without knowing the reasons behind" the denial. *Lindell*, 377 F.3d at 658. For these reasons, Defendants' motion to dismiss on Count III is denied.

### 3. Denial of Access to Courts and Counsel (Count IV)

Thurman also claims that the Officers denied him meaningful access to the courts and counsel by failing to take him to ten court dates and preventing him from communicating with his attorneys. (Dkt. 1) at ¶¶ 43–50, 83–87. This resulted in the delay of his case and his prolonged detention in the hospital. *Id.* at ¶ 86. "The Constitution protects a prisoner's right of access to the courts; state actors must respect that right by not impeding prisoners' efforts to pursue legal claims." *Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir. 2009); *see also Guajardo-Palma v. Martinson*, 622 F.3d 801, 802 (7th Cir. 2010) ("The Fourteenth Amendment guarantees meaningful access to courts, [and] . . . the opportunity to communicate privately with an attorney

is an important part of that meaningful access.") (quoting *Dreher v. Sielaff*, 636 F.2d 1141, 1143 (7th Cir. 1980)). "That right is violated when a prisoner is deprived of such access and suffers actual injury as a result." *Ortiz*, 561 F.3d at 671.

Thurman's allegations implicate "official acts claimed to have denied access [that] may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Christopher v. Harbury*, 536 U.S. 403, 414 (2002) (internal citations omitted). This particular category of access claims does not "look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* Because such claims are brought to secure relief "unobtainable in other suits, the remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim." *Id.* at 416.

Although fact pleading is unnecessary, in order to state a colorable claim, "a prisoner must show actual substantial prejudice to specific litigation." *Gentry v. Duckworth*, 65 F.3d 555, 559 (7th Cir. 1995); *see also Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006); *Pratt v. Tarr*, 464 F.3d 730, 731–32 (7th Cir. 2006) (a prisoner's complaint must spell out the connection between the alleged denial of access to legal materials and an inability to pursue a legitimate challenge to a conviction, sentence, or prison conditions). In other words, to allege a violation of the right to access to the courts, Thurman must identify the underlying claim that was lost, describe the official acts frustrating the litigation, and identify remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. *Christopher*, 563 U.S. at 415–16.

Although Thurman has sufficiently alleged that the Officers caused delay in his criminal proceedings by failing to bring him to ten scheduled court appearances, Defendants argue that Thurman has failed to properly allege the other two elements in his backward-looking denial-of-access claim: a poor ending or remedy not otherwise available. (Dkt 15) at 10; (Dkt. 24) at 9.

On this claim, Thurman relies on *May v. Sheahan*, 1999 WL 543187 (N.D. Ill. July 21, 1999), *aff'd*, 226 F.3d 876 (7th Cir. 2000) for support. (Dkt. 23) at 12. Similar to the plaintiff in *May*, as a result of the alleged denials Thurman's case was delayed, he remained in custody for longer, and his ability to post bond was hindered. (Dkt. 1) at ¶ 86. However, unlike the plaintiff in *May*, Thurman fails to state a claim for denial of access to the courts. First, Thurman has not offered any allegations indicating that he lost a claim or was otherwise prejudiced on account of the delays. In fact, the Complaint indicates that he was successful in his defense to the charges. So nothing ended "poorly" for Thurman. Second, *May* was decided before *Christopher*, which added a third prong of to analysis of these types of claims: whether there is a remedy that may be awarded as recompense but not otherwise available. *Christopher*, 563 U.S. at 415. Here, Thurman has requested the same damages—compensatory, punitive, fees, and costs—for all of his claims. The relief Thurman requests for his denial of access to courts damages, is essentially the same relief he would receive if he eventually prevails on his claims for First Amendment Violation (Count III) and Denial of Right to Timely Arraignment (Count V). Thurman is therefore not requesting a remedy related to the denial of access to courts that he cannot obtain through another procedure, and he fails to state a claim. *Christopher*, 536 U.S. at 415. Count IV is dismissed.

### 4. Denial of Right to Timely Arraignment (Count V)

Thurman alleges that he was not arraigned for more than two months in violation of his Fourteenth Amendment rights. (Dkt. 1) at ¶¶ 44–45. In *Coleman v. Frantz*, the Seventh Circuit

found that the plaintiff's 18-day detention without an appearance before a judge deprived the plaintiff of liberty without due process of law. 754 F.2d 719, 723 (7th Cir. 1985). A denial of due process occurs when state action "shocks the conscious" of the court and is so "offensive to the concept of ordered liberty." *Rochin v. California*, 342 U.S. 165, 172 (1952); *Palko v. Connecticut*, 302 U.S. 319, 324–25 (1937). The Seventh Circuit has also found that holding the plaintiff for 17 days before being charged before a judicial officer stated a claim under § 1983. *Sivard v. Pulaski Cty.*, 959 F.2d 662, 666 (7th Cir. 1992) (analyzing claim under the Fourth Amendment); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 45 (1991) (stating that "[w]here an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a *bona fide* emergency or other extraordinary circumstance.").

If an 18-day detention without appearance before a judge can "shock the conscious" and violate the right to due process of law, certainly being denied an arraignment for over two months is sufficient to state a claim, particularly where Thurman also alleges that he was arrested "without probable cause." *See Coleman*, 754 F.2d at 723. Thurman had a constitutional right to prompt appearance in front of a judge after he was detained, and his two-month pretrial detention without an arraignment is enough to allege conduct that "shocks the conscious."

Defendants argue otherwise, looking to Illinois caselaw holding that a defendant's right to be present at an arraignment is not absolute. *See* (Dkt. 15) at 11 (citing *People v. Lindsey*, 201 Ill. 2d 45 (2002)). But the issue raised by Thurman's Complaint is his untimely arraignment, for which he was present 71 days after his arrest, not that the arraignment proceeded in his absence. Thurman has adequately alleged an unconstitutional denial of his right to a timely arraignment.

## C.     *Monell* Claim (Count VII)

Next, Thurman claims that Sheriff Dart (in his official capacity) and Cook County are liable under § 1983. A municipality can be liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law or (3) if a person with final policymaking authority for the county caused the constitutional violation. *Monell*, 436 U.S. at 690; *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690); *see also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (stating that "[t]he critical question under *Monell* . . . is whether a municipal [] policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."); *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (to adequately allege a *Monell* widespread practice claim, a plaintiff must plead factual content that allows the Court to draw the reasonable inference that the municipality maintained a policy, custom or practice that contributed to the alleged violation).

Here, Thurman alleges that Sheriff Dart is liable under *Monell* for the following four widespread practices in which Dart:

1.     denied detainees hospitalized and detained outside of Cermak or Cook County Jail the right to live in humane conditions that provided for their basic needs, and that did not amount to punishment, by shackling them to hospital beds around the clock . . . ;

2.     denied detainees hospitalized and detained outside of Cermak or Cook County Jail the right to associate with friends, family, and loved ones, by denying them visits and denying them access to phones, pens, and paper . . . ;

3.     denied detainees hospitalized and detained outside of Cermak or Cook County Jail access to the courts and counsel and to participate meaningfully in their criminal defenses, by not taking them to scheduled court appearances, denying them access to phones, denying them visits, denying them access to attorneys, and denying them the ability to read or write anything . . . ; and

4.    denied detainees hospitalized and detained outside of Cermak or Cook County Jail the right to timely arraignments . . . .

(Dkt. 1) at ¶¶ 103. Each of the four alleged widespread practices are related to one of Thurman's claims, Counts II, III, IV, and V respectively. *Id.* Without addressing the alleged practices individually, Defendants argue that Thurman's *Monell* claim is deficient because the Complaint solely revolves around Thurman's personal circumstances from March to May 2017. (Dkt. 15) at 13. Although a plaintiff may rely on his own experience to state a *Monell* claim, *see White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016), Thurman's allegations in paragraph 103—considered along with his Complaint as a whole—lack sufficient factual support to allow the Court to draw the reasonable inference that any of the alleged deficiencies or failures constituted a custom or practice so widespread for which Sheriff Dart or the County is liable. *McCauley*, 671 F.3d at 616; *see Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (holding that the specific actions of government employees in the plaintiff's case alone, without more, did not create the reasonable inference that a widespread practice existed); *see, e.g., Garcia v. City of Chicago*, 2018 WL 3546742, at *3 (N.D. Ill. July 24, 2018) (dismissing *Monell* allegations where "Garcia has not provided any facts to support his claim that the City maintains a policy or practice of failing to supervise or control its officers and that such a policy or practice caused his injuries."). Although Thurman alleges that the repeated denials in his case (of movement, association, and access to court) demonstrate a pattern of behavior that can support a widespread practice claim ((Dkt. 23) at 14), the Court finds that these allegations are too vague and Thurman's "circumstances are still too unique to evince the existence of a policy." *Gonzalez v. Dart*, 2017 WL 3434128, at *3 (N.D. Ill. Aug. 10, 2017).

Despite the fact that the Complaint references an agreement "entered into as a result of *May v. Michael F. Sheahan*, No. 99 C 395" ((Dkt. 1) at ¶ 112; *see also* (Dkt. 23) at 15), it does not

even attempt to explain how whatever agreement to which it refers is applicable to the situation at hand. Even if Thurman had provided the referenced agreement or specifically identified the document, "[i]t is not the Court's duty to dig through that document in search of items that may support [Thurman's] various *Monell* allegations." *Scott-Pitts v. County of Cook*, 2018 WL 3626991, at *4 (N.D. Ill. July 30, 2018). Further, "a complaint must allege facts, and [a] cursory reference to a 'widespread practice' as alleged in another case does not raise the plausibility of a *Monell* claim against the Sheriff's Office above a speculative level in this case." *Johnson v. Sheriff of Cook County*, 2015 WL 1942724, at *2 (N.D. Ill. Apr. 24, 2015). Because Thurman's allegations are vaguely worded, conclusory, and find their only support in Thurman's own experiences, the Complaint fails to plausibly allege that Thurman's various injuries were the result of the County's various widespread policies. Thus, he has failed to sufficiently allege a *Monell* claim. *See Gill*, 850 F.3d at 344. Count VII is dismissed.

**D.      Indemnification (Count VI)**

Last, Plaintiff asserts an indemnification claim under the Illinois Tort Immunity Act, 745 ILCS 10/9-102, which directs municipalities to pay compensatory damage judgments for torts committed by their employees while acting within the scope of their employment. (Dkt. 1) at ¶ 96–100; *Yang v. City of Chicago*, 137 F.3d 522, 524 (7th Cir. 1998); *see also Ivy v. Powers*, 2009 WL 230542, at *2–3 (N.D. Ill. Jan. 30, 2009) (stating that "[i]ndemnification is applicable if the Defendant Officer, while acting within the scope of employment, [is] liable for any" of the Section 1983 claims asserted."). The County moves to dismiss the indemnification claim on the basis that the other claims are subject to dismissal. Because certain of Thurman's other claims survive dismissal, the indemnification claim will not be dismissed on this basis.

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part the Motion to Dismiss. (Dkt. 15). Specifically, the Motion is granted with regard to Counts IV and VII; the Motion is denied in all other respects.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: October 26, 2018